[Crim. No. 4093. First Dist., Div. One. Aug. 29, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. AMOS MARSHALL ARKETA, Defendant and Appellant.

*Assigned by Chairman of Judicial Council.

Kenneth J. Levy, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny and Eric Collins, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—After a trial by jury, the defendant was convicted of burglary in the second degree. He appeals from the judgment. His sole contention before us is that the court committed reversible error in admitting against him evidence obtained by illegal search and seizure.

At some time between 3 :45 a. m. and 6 a. m. on August 11, 1961, Chris' Coffee Shop in Santa Rosa was broken into and money totalling approximately $387 taken from a jukebox and two cash drawers in the upstairs office. When the owner opened the restaurant at 6 a. m. he discovered that the money had been taken and notified the police.

The report of the burglary was brought to the attention of Chief of Police Flohr of the Santa Rosa Police Department when he came on duty at 7 :45 a. m. There had been other burglaries in Santa Rosa during the preceding three weeks, some of them in the vicinity of the above coffee shop. Chief Flohr had been acquainted with the defendant for about 10 years, knew that the defendant had committed burglaries and thefts in the past and knew that he was on parole. In addition, information came to Flohr at the time of the report that the defendant had been seen in the coffee shop at 1 a. m. that morning. Flohr accordingly decided to go to defendant's residence and question him.

The chief, accompanied by two of his officers, arrived at the defendant's apartment about 8 a. m. All were in uniform. They did not have a search warrant. During a hearing on objections to the admission of the evidence here involved,

before the court but outside of the presence of the jury, Flohr testified that he knocked at the door and the defendant opened it. Since the other two officers were 60 to 70 feet away, he whistled to them to come over. The defendant was in shorts and a T-shirt or undershirt. Flohr said: "Amos, we have got problems in Santa Rosa. . . . We come out to look the place over." According to Flohr, the defendant thereupon replied: " 'Come on in and go ahead.' " Officer Winkler, who had been summoned by Flohr and was about 10 feet away from the door when this conversation took place, testified that "the exact conversation I'm not certain of, however, I know the Chief said: 'Amos, we've got problems, is it all right if we come in and look around' [and that the defendant said] 'Go Ahead.' " The defendant testified in the course of the proceedings outside the presence of the jury that he answered the door and said "Good morning" to Chief Flohr; that the latter "made no remarks" but turned and "whistled and hollered" to the two other officers; that he did not at any time give permission to the officers to search his apartment; that "then I attempted to close the door and was unable to do so because it was obstructed by . . . Flohr's body so then I just turned around and I proceeded down to the end of the hall and through kitchen and into my living room."

There was also evidence that the defendant, in a statement given by him to the district attorney later that morning, admitted that he had not objected to Chief Flohr's "looking around" his house. Defendant, during the course of his above testimony, admitted making such a statement but attempted to explain it by saying: "It had to be all right because I had no other choice. There is me, I'm confronted with three officers and I couldn't object."

After the three police officers entered the apartment, Chief Flohr told the defendant to put some clothes on and sit on a couch. The three men then proceeded with the search. It disclosed $251 found in a first-aid kit in a hallway attic of the apartment, including a roll of quarters and thirteen quarters which were colored pink and red; $30.61 found in a piggy bank; and $60 in currency found in an envelope marked "Rent." At the trial, the owner of the coffee shop identified the thirteen quarters as being those used by him to play the jukebox as a courtesy for customers. The coins were colored so that they could be distinguished from those of the customers and returned to the owner by the jukebox company. There was other expert opinion evidence that eleven of the coins were

substantially identical with other coins currently being used in the jukebox by the owner. In addition, the owner identified the roll of quarters as bearing his bank's name on the wrapper and testified that he usually obtained such wrapped coins from his bank for change.

The above search also disclosed a pair of appellant's shoes which were damp and had mud on them. Shortly after he found them, Police Lieutenant Clark, who had accompanied Chief Flohr, made an investigation along the bed of the Santa Rosa Creek, which ran in the rear of the coffee shop as well as in the rear of appellant's apartment, the distance between the two places being about two long city blocks. He found six or seven shoe prints along the muddy bed of the creek and also noticed that the right shoe found in appellant's apartment "fit perfectly" into the impression in the mud. Clark's investigation also disclosed that the tracks did not continue on along the creek beyond appellant's apartment, although he found no tracks leading directly to the apartment from the creek itself. Expert opinion evidence also established that the mud on the shoes and soil taken from a pipe near the coffee shop were substantially similar.

Although there is some confusion in the record as to when the defendant was arrested, it is susceptible of the construction that he was arrested after the search was finished. At that time, upon instructions of the chief, he was taken to the police station and booked.

At the trial the property found in defendant's apartment—the first-aid kit, the money contained therein, the money in the piggy-bank, the currency in the "Rent" envelope, and the defendant's shoes—were all admitted in evidence over the defendant's objection that they were obtained by illegal search and seizure. In admitting such evidence, the trial court stated that the police officers had a right to question the defendant, that their testimony bearing upon the defendant's consent to the search was credible and that the prosecution had sustained its burden of establishing such consent.

Defendant claims that such evidence was inadmissible because, first, there was no reasonable cause for arrest or search; and secondly, there was no free and voluntary consent to the search and even if consent were given, the search extended beyond the scope of the permission granted.

 Where one freely consents to an entry into or search of his home, "his constitutional rights are not violated and any

search or taking of evidence pursuant to his consent is not unreasonable." (*People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852]; *People* v. *Gorg* (1955) 45 Cal.2d 776, 782 [291 P.2d 469].) Such consent being shown, it is not necessary "for the People to show that the search and seizure were reasonable as incident to a proper arrest, . . ." (*People* v. *Burke* (1956) 47 Cal.2d 45, 49 [301 P.2d 241].) ▪ As stated in *People* v. *Michael, supra,* 45 Cal.2d 751 at page 753: "Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances." (See also *People* v. *Gorg, supra; People* v. *Burke, supra.*) On such question it is the province of the trial judge to pass upon the credibility of the witnesses and weigh their testimony (*People* v. *Cunningham* (1961) 188 Cal.App.2d 606, 609 [10 Cal.Rptr. 604]) and "determine the fact as to whether or not consent was given." (*People* v. *Fields* (1959) 167 Cal.App.2d 773, 776 [334 P.2d 1001].)

▪ In the case before us, there is a conflict in the evidence on the issue of the defendant's consent to the search of his apartment. According to the testimony of the police, when Chief Flohr told the defendant that they had come out "to look the place over," the defendant replied " 'Come on in and go ahead.' " In the subsequent statement to the district attorney, he admitted he had not objected to the search. Nor did the defendant at any time take the position that he had uttered words of consent but that he was forced by the police into giving permission. According to the defendant, he did not give consent to the search at any time and even tried to shut the door on the chief. This conflict, including the question whether the consent was freely given in the light of all the circumstances, was resolved in favor of the police officers by the trial court. Sufficient evidence supports the trial court's determination that the defendant's consent was freely given.

▪ By virtue of such consent, the officers had a right to make a reasonable search of all of the premises under the defendant's control. (*People* v. *Dixon* (1956) 46 Cal.2d 456, 458-459 [296 P.2d 557]; *People* v. *Gorg, supra,* 45 Cal.2d 776, 783.) This included the attic over the hallway where the money was found. The hallway, being inside and an integral part of defendant's apartment, was clearly an area under his control. Defendant's contention that this area was beyond the scope of the permission must be rejected.

We conclude that on the record before us, the search was

legal because freely consented to by the defendant. In view of such conclusion, it is not necessary for us to discuss defendant's remaining contention that there was no reasonable cause for the arrest or search.

The judgment is affirmed.

Bray, P. J., and Devine, J.,* concurred.

A petition for a rehearing was denied September 12, 1962, and appellant's petition for a hearing by the Supreme Court was denied October 24, 1962.

*Assigned by Chairman of Judicial Counsel.